THE PEOPLE *ex rel.* James S. Pollard *et al.*

*v.*

CHARLES P. SWIGERT, Auditor.

*Filed at Springfield October 31, 1889.*

1. DRAINAGE LAW—*drainage bonds—powers of commissioners.* The only powers that are expressly granted to drainage commissioners in respect to sub-districts that are at their option formed, are to make the division, and then to classify the lands therein, and make assessments as in original districts ; and the statute provides that the funds arising therefrom shall be kept as a separate and distinct fund, to be used in the sub-district from which collected. From these powers there would be no implied authority vested in the commissioners to issue bonds for an assessment made by them upon lands and property in the sub-districts.

2. No power is anywhere in the statute, either expressly or by implication, vested in the commissioners of either township or union districts to issue bonds or notes for unpaid assessments or installments thereof, for districts or sub-districts, or to issue any notes or bonds whatever, for any purpose or under any circumstances.

3. Special districts alone are authorized to issue bonds for unpaid assessments or installments thereof, and they can not issue the bonds of the district for the indebtedness of a sub-district. Such sub-districts are not independent bodies, corporate and politic, but are dependent upon the original organization, and the corporate authorities for the main district act for the sub-districts.

4. While the commissioners of a special district have power, under the statute, to form sub-districts, they have no lawful authority to issue bonds for an unpaid assessment made in one of such sub-districts, or for any part thereof ; and even if they had the power to issue the bonds of the sub-district, bonds of the original or main district would be void, and not entitled to registry in the Auditor's office.

This is an original suit in this court, wherein James S. Pollard and Milton A. Goff, partners, under the firm name of Pollard & Goff, filed a petition for a writ of *mandamus* to compel the Auditor of Public Accounts to register certain bonds. The Auditor answered the petition, and the questions involved in the case arise upon a demurrer to his answer.   The facts

of the case appear in the petition and answer, and, so far as they are material to a consideration of the questions that arise in this controversy, may be briefly stated.

The "Lake Fork Special Drainage District, in the counties of Piatt, Champaign and Douglas, and State of Illinois," was duly organized in 1882, under the Drainage act, approved May 29, 1879, and in force July 1, 1879, and the several acts amendatory thereof. The drainage commissioners of said special drainage district, after the location, construction and completion of a main drain or outlet to carry off the waters of said district, divided the district into thirty-one sub-districts, and numbered them from one to thirty-one, inclusive. A levy and assessment of $2000 was made upon the lands and property benefited in sub-district No. 10, and was collected. Subsequently, in 1887, an additional sum of $14,000 was levied as a special assessment for drainage purposes on the lands and property benefited in sub-district No. 10. Said assessments of $2000 and $14,000, respectively, were upon the lands and property of said sub-district No. 10 only, and were for the payment of benefits to lands and property in said sub-district No. 10 only, and the improvements to be paid for by said assessments were not benefits to any other lands or property, and were no part of the main drain or general system of drainage for the benefit of the entire Lake Fork Special Drainage District. The commissioners did not, at the time the levy of $14,000 was made, order the tax to be paid in installments, but tax lists for the whole of the assessment of $14,000 were placed in the hands of the treasurer of the district for collection on the first day of July, 1887, and remained in his hands until the 14th day of November, 1887, and during the intervening period of about four and a half months the treasurer collected $8408.18 of said assessment, leaving unpaid thereon the sum of $5591.82. Thereupon, on the 14th day of November, 1887, the drainage commissioners of Lake Fork Special Drainage District, in the counties of Piatt, Champaign and Douglas,

39—130 ILL.

and State of Illinois, made an order postponing the payment of said $5591.82, until the first day of September, 1892, and issued bonds for ninety per cent of the unpaid and postponed $5591.82, with interest coupons attached. Four of said bonds were for $1000 each, and the fifth was for $1032.64. The bonds and coupons were alike, except in respect to amounts and dates of maturity. One of said bonds reads as follows:

*"No. 35.*                                              *$1000.*

UNITED STATES OF AMERICA; COUNTY OF PIATT;
STATE OF ILLINOIS.

*Construction Bond. — Lake Fork Special Drainage District.*

"On the first day of May, 1893, for value received, the Lake Fork Special Drainage District promises to pay to the bearer hereof the sum of $1000, in lawful money of the United States, at the fiscal agency of the Treasurer of the State of Illinois in the city of New York, State of New York, with interest at the rate of seven per cent per annum, from the first day of December, 1887, until paid, as is shown by and upon the surrender of the interest coupons as they severally become due.

"This bond is one of five bonds issued by said drainage district, four being for the sum of $1000 each, and one being for the sum of $1032.64, all being of like date, bearing like interest, payable at like time and place, and issued on the second assessment of sub-district No. 10 of said Lake Fork Special Drainage District, confirmed on the 25th day of June, 1887, against all the lands within said sub-district No. 10 at the date of such confirmation, the payment of the unpaid portion of said assessment being duly extended until September 1, 1892, and on which assessment there remains unpaid the sum of $5591.82.

"All said bonds are issued under and by virtue of the 63d section of an act of the General Assembly of the State of Illinois, entitled 'An act to provide for drainage for agricultural and sanitary purposes, and to repeal certain acts therein named,' approved June 27, 1885, in force July 1, 1885, for

the payment of which principal sum, and the interest coupons attached, the faith of said Lake Fork Special Drainage District is hereby irrevocably pledged, together with the unpaid assessments above described in sub-district No. 10, becoming due September 1, 1892, upon which this bond and coupons attached are based, and are constituted a special lien for the payment thereof.

"And we, the commissioners of said special drainage district, do hereby certify that all requirements of law have been fully complied with in making said assessment and extending the time of payment thereof, and in making and issuing said bonds.

"In testimony whereof, etc.

LAKE FORK SPECIAL DRAINAGE DISTRICT, ETC.

Signed:

By TIMOTHY FOOHY, [Seal.]
P. T. GALLIVAN, [Seal.]
CHARLES B. MOORE. [Seal.]
*Commissioners of District.*"

To each of said bonds five coupons are attached, one of which reads as follows:

"*No. 35.* $70.00

"On the first day of May, 1893, the Lake Fork Special Drainage District, in the counties of Piatt, Champaign and Douglas, and State of Illinois, will pay the bearer, at the fiscal agency of the Treasurer of the State of Illinois in the city of New York and State of New York, $70, lawful money of the United States, being one year's interest on their bond numbered as above."

The petitioners presented the bonds in question to the Auditor, for registration, and tendered him the fees allowed by statute, and presented to him a sworn statement made by the commissioners of the drainage district, but registration of the bonds was refused.

Mr. S. R. REED, and Mr. H. H. CREA, for the relators.

Mr. GEORGE HUNT, Attorney General, for the respondent.

Mr. JUSTICE BAKER delivered the opinion of the Court:

The Drainage act approved June 27, 1885, and in force July 1, 1885, is a revision and amendment of the Drainage law of 1879, in force July 1, 1879, and of several other acts therein mentioned, and its provisions govern in respect to all the matters here at issue.   Laws of 1885, p. 77, etc.

Section 11 and section 30, and all the intervening sections of the act, relate to the formation, in counties under township organization, of drainage districts composed of lands that are all located in one township, or to what are called combined or township drainage districts, and to the powers and duties of the commissioners and officers of, and the mode of procedure in, such districts.   It would seem that section 31, and most, if not all, of the sections that follow, to section 47, inclusive, are general in their character and scope, and are intended to have application to drainage districts organized or operating under the act, irrespective of the question whether they are township, union or special drainage districts.   Section 48 relates to union drainage districts, or such as are formed where the lands lie in two towns in the same or different counties, both under township organization; and in respect to such districts it is provided that the clerk and commissioners shall have like powers and duties as provided for such officers in districts wholly in one town.   Section 49, and most of the following sections, relate to special drainage districts, or such as are formed where the lands lie in three or more towns in the same or different counties, or in a county not under township organization, or partly in a county under township organization and partly in a county not under township organization.

Section 43 is the only section of the act which purports to treat of sub-districts; and it not only provides for the formation of sub-districts by the owners of land in main districts, for the purpose of local or more minute drainage in the manner provided in the act for the organization of main districts,

but also provides that "in drainage districts organized or proposed to be organized, which have one or more lateral drains or proposed drains, which are independent of each other, except as to the main drain or outlet, and which do now or will drain separate areas within said district, it shall and may be lawful for the commissioners, at their option, to divide the district into as many sub-districts as there are separate areas, for the purpose of making assessments of benefits for the work to be done in said sub-district."

The contention that the authority thus given to commissioners to make sub-districts is not granted to the commissioners of special drainage districts, for the reason the section granting the power is found in that part of the Drainage law which relates to drainage districts lying wholly in one township, and wherein the commissioners of highways are *ex officio* drainage commissioners, we do not regard as well grounded. The section is found among those which are general in their character, and applicable alike to township, union and special drainage districts, and from the position of the section in the act, and from its subject matter, there is ground for the conclusion it was intended to be so applicable. But whether this be the correct view or not, is unimportant to the present inquiry. The latter part of section 52 of the act provides, that the commissioners of a special drainage district "shall be the corporate authorities thereof, and shall be a body politic and corporate, with like powers as herein conferred upon other drainage commissioners, either by this act or other laws of this State." Regardless of what the powers of the commissioners of a special drainage district would be without this latter provision, it is very plain therefrom that the commissioners of the "Lake Fork Special Drainage District, in the counties of Piatt, Champaign and Douglas, and State of Illinois," had ample authority to form sub-districts.

The purpose for which drainage commissioners are given authority to form sub-districts is declared by the statute to be

that of making assessments of benefits for the work to be done in said sub-districts. The only powers that are expressly granted to the commissioners in respect to sub-districts that are at their option formed, are to make the division, and then to classify the lands therein, and make assessments as in original districts; and the statute provides, that "the funds arising therefrom shall be kept as a separate and distinct fund, to be used in the sub-district from which it was collected." From these powers there would be no implied authority vested in the commissioners to issue bonds for an assessment, or part of an assessment, made by them upon the lands and property in the sub-district. We have seen that the section is alike applicable to township, union and special districts, and while, by the statute, union districts are given like powers with township districts, and special districts are granted all the powers conferred upon either township or union districts, yet the converse of this is not true, and township and union districts are nowhere invested with all the powers that are granted to special districts. Nor is power anywhere in the act, either expressly or by implication, vested in the commissioners of either township or union districts to issue bonds or notes, either for unpaid assessments or installments thereof, or for any part of any such assessment or installment, either for district or sub-districts, or to issue any notes or bonds whatever, for any purpose or under any circumstances.

If, then, the commissioners of Lake Fork Special Drainage District, in the counties of Piatt, Champaign and Douglas, and State of Illinois, had authority to issue bonds for any portion of the unpaid assessment for benefits made by them in sub-district No. 10, it must necessarily be by virtue of power conferred by some section of the statute that is applicable only to special drainage districts. The claim made is, that the bonds are authorized by the *proviso* contained in section 63. That *proviso* is as follows: "*Provided, however*, if, in the judgment of the commissioners, the payment of said tax,

or any installment or installments thereof, for the speedy completion of the proposed work, would be too heavy a burden upon the owners and persons interested to pay in time to be used for said work, the commissioners may, at any time after the levy has been made, postpone the payment of such tax or of any one or more installment or installments, or any part thereof, to such time or times as they may think proper and advisable, but not longer than fifteen years from the time of the levy thereof. For the construction of the proposed work, or for the continuation and completion of the same where it has been commenced, the commissioners may borrow money, not exceeding in amount ninety per cent of any assessment or levy unpaid at the time of borrowing, and may secure the payment of the same by notes or bonds of said district, bearing interest not to exceed seven per cent per annum. The interest may be made payable annually or semi-annually, which notes or bonds may be made due and payable at the same or different times, but shall not run beyond one year after the last assessment or levy on account of which the money is borrowed falls due, which notes or bonds shall not be held to make the commissioners personally liable for the money borrowed, but shall constitute a lien upon the assessment or assessments, levy or levies, on account of which they are issued, for the repayment of the principal and interest thereon."

It is evident, upon examination, that the division of the matter contained in sections 62 and 63 into two sections, is purely arbitrary, and that such matter is to be considered as though it were all contained in one and the same section. It also appears from said sections, that the "tax" referred to in the *proviso* is one arising out of "any levy made as herein provided." The language of the statute is somewhat ambiguous, but we think the assessments or levies mentioned in the *proviso*, and the payment of which, or of any installment or installments of which, or any part thereof, may be postponed by the commissioners, and money borrowed by them not exceeding

in amount ninety per cent of the assessment or levy remaining unpaid, to be secured by the notes or bonds of the district, are the district assessments provided for in section 62 and the additional district levy or levies mentioned in section 63. No provision is made in either section 62 or section 63 for any sub-district assessment; but sub-district assessments are mentioned and provided for only in section 43 of the act, although it is true that it is there enacted that such assessments are to be made in the same manner that assessments are made in original districts.

The provision made in section 63 is for the issuing of the "notes or bonds of said district," and the presumption must be, that if it had been the legislative intention that notes or bonds might be executed by or on behalf of a sub-district or for an unpaid sub-district assessment, or a part thereof, such intention would have been clearly indicated. It is expressly stated in section 43, that the sub-district shall not have any claim upon the funds of the main district for its local use, and it would be an anomaly that bonds of the entire original district should be issued for the indebtedness of a sub-district. The sub-districts organized at the option of the commissioners of the main district are not independent bodies politic and corporate, but are dependent upon the original organization, and the corporate authorities of the main district act for the sub-districts; and had it been intended that negotiable paper should be based upon the unpaid assessments of a sub-district, it is but reasonable to suppose the law would have indicated the form and effect of such paper, and the manner in which it should be executed, and would not have directed that the bonds or notes of the "district" should be given therefor. Were the sub-district in a township or union district, no bonds or notes could be issued for unpaid taxes for benefits, and as the provisions found in the act in regard to sub-districts are all contained in section 43, and are alike applicable to all sub-districts organized by commissioners of main districts, whether

township, union or special districts, it is to be presumed, in the absence of a clear indication of a legislative intention otherwise, that bonds or notes can not be issued for unpaid assessments of the sub-district, it being formed by the commissioners of a special drainage district.

Various other sections of the statute, which follow this section 63, tend to show that while it was contemplated that bonds or notes would be issued based on district assessments, yet that bonds or notes for sub-district assessments were not in contemplation. Section 64 provides for funding notes or bonds issued for an assessment, and executing new notes or bonds; but while the "district" is mentioned, there is no reference therein to a "sub-district." Section 65 provides for the issuing of bonds for unpaid assessments upon the petition of a majority of the owners of land in special drainage districts, but it makes no mention of sub-districts. Section 66 makes provision for the keeping of a record by the corporate authorities of the district of all bonds issued, and designates what matters of information shall appear upon the face of such record, but it contains no allusion to sub-districts or sub-district assessments. Section 67 makes it the duty of the Auditor of Public Accounts to register, upon presentation, in a book kept for that purpose, all bonds issued under the provisions of the act, and it specifically points out what such registration shall show. The matters so required to be shown are: The date, amount, number, date of maturity, rate of interest, time when such interest is payable, place of payment of the principal and interest of such bond, under what act issued, by what district issued, and the name of the person or persons presenting the same for registration. If it had been within the legislative contemplation that bonds would be issued under the act by a sub-district, or for or on behalf of a sub-district, it would seem it would have been required the registration in the office of the Auditor should show such sub-district. So, also, under section 68, the Auditor's certificate sent to the county clerk shows

the amount necessary to pay the interest, or interest and principal, "of such particular district," which is to be levied "within the limits of such district," and this amount is, by the district clerk, to be apportioned "in such district," and a *pro rata* share extended as a tax against "the lands and property in the district." There is no suggestion whatever in the section, of a sub-district. In section 70, the references are to "the lands and property in said district," to the "notes or bonds of the district" and "bonds of the district," without any mention of sub-district or sub-district bonds. In section 72, the "notes or bonds of the district" are in like manner spoken of, and no mention made of sub-districts or sub-district bonds. It is hardly reasonable to suppose that if it had been contemplated and intended that bonds might be issued by or on behalf of a sub-district, or for a sub-district assessment, there would have been such an entire omission in each and every one of these numerous sections relating to drainage bonds, of any reference whatever to sub-districts or sub-district bonds.

Neither township drainage districts nor union drainage districts are, under the law, given the privilege of issuing bonds for unpaid assessments, or any part thereof, even where such assessments are made for the whole district. The General Assembly saw fit to confine that privilege to special drainage districts. Sub-districts, even when they are formed in a special drainage district that includes lands in three or more counties, may be, and frequently are, very small in area, and include the property of but a few land owners, and it would seem, the policy of the law which would deny the right of issuing negotiable bonds and paper in township and union districts, would also deny such right to all mere sub-districts.

In section 78 is found another reason why the provision in section 63 for the issuing of district bonds for assessments in special drainage districts should not be held to apply to this sub-district No. 10. A sub-district may be formed in a main district, either by the act of the commissioners or "by the

owners of land, * * * in the manner provided in the act
for the organization of main districts." If this sub-district
had been organized "by the owners of land," thereby giving it
an independent corporate existence, and it embraced within
itself lands in three or more townships, it might possibly, al-
though a sub-district, be regarded as something more than a
*mere* sub-district, and as a special district within the purview
of the act, since it would have had all the essential attributes
of a main special district. But it was not formed by the act of
the land owners, has no autonomy of its own, and is not in
three towns. Not only is the power to issue bonds a special
power granted to a particular class of districts, and, by neces-
sary implication, withheld from all other districts, but in the
latter part of said section 78 it is enacted that "the special
provisions of this act for their own class of districts shall apply
only to such districts." As we understand this provision, it
very plainly excludes the idea that the special provision made
for special drainage district bonds is applicable to sub-districts
under section 43, without such sub-districts are autonomous
and complete special drainage districts within themselves.

Even if bonds for postponed and unpaid assessments could
lawfully be issued by or on behalf of a sub-district organized
by the commissioners of a special drainage district, yet there
would be a serious and fatal objection to the bonds here in
question. These bonds were issued by the Lake Fork Special
Drainage District, in the counties of Piatt, Champaign and
Douglas, and State of Illinois, and contain absolute and posi-
tive promises on the part of said Lake Fork Special Drainage
District to pay the several sums of money mentioned in them,
respectively, and by the terms of the contract the faith of said
Lake Fork Special Drainage District is irrevocably pledged
for the payment of the principal sums named in said bonds,
and the interest coupons attached. It is true that in the body
of the bonds the statement is made that they are "issued on
the second assessment of sub-district No. 10 of said Lake Fork

Special Drainage District," and also the further statement that for payment of the bonds and coupons, "together" with the faith of the main district, is pledged "the unpaid assessment above described in sub-district No. 10, becoming due September 1, 1892, upon which this bond and coupons attached are based, and are constituted a special lien for the payment thereof." They do not purport, however, to be the bonds of the sub-district, or to be payable only out of the proceeds of the unpaid and postponed assessment of the sub-district, but the promise of the main district to pay is direct and unconditional. In the coupons attached, there is no reference whatever to either the sub-district or any assessment, and all that is found in them are simple and unqualified promises on the part of the Lake Fork Special Drainage District to pay the bearer, at the place and times mentioned therein, the sums of interest money specified in them, respectively. Section 43 of the Drainage act provides, as we have heretofore stated, that the funds arising from assessments made in sub-districts "shall be kept as a separate and distinct fund, to be used in the sub-district from which it was collected," and that the formation of sub-districts shall not give to any such sub-district "any claim upon the funds of the main district for its local use." We can not accede to the suggestions made by petitioners, that the promises to pay, made in the bonds and coupons, are simply promises to pay by or with the unpaid assessment in sub-district No. 10, and that the language, "for the payment of which principal sum, and the interest coupons attached, the faith of said Lake Fork Special Drainage District is hereby irrevocably pledged," is simply a pledge by the commissioners that the unpaid and postponed assessment will be used in the payment of the bonds at their maturity, and that the corporate authorities will exercise whatever power is given to or duty imposed on them by law, towards the payment of the interest on such bonds as the same accrues. The contracts attempted to be made by the Lake Fork Special Drainage District are plain and unambig-

·uous, and the language used in the bonds and coupons will not bear the construction sought to be placed upon it. The ·drainage district had no power, under the law, to issue bonds binding itself for the payment of an assessment made in one ·of its sub-districts, for work done in and solely for the local benefit of such sub-district.

Our conclusions upon the case presented by the record are, that while the commissioners of Lake Fork Special Drainage District had power, under the statute, to form sub-districts,. yet that they had no lawful authority to issue bonds for an unpaid assessment made in one of said sub-districts, or for any part thereof; and that even if they could be held to be vested with such authority, the bonds here involved would not be legal, and such as they could lawfully issue.

For the reasons herein stated, the demurrer to the answer ·of the Auditor of Public Accounts is overruled, a writ of *mandamus* is denied, and the petition dismissed at the cost of the petitioners. *Writ denied.*